IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:13-CR-210-1 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID DONADEO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

## DEFENDANT DAVID DONADEO'S SENTENCING MEMORANDUM

---

John F. McCaffrey (0039486)
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
Telephone: 216.696.3486
Facsimile:  216.592.5009
john.mccaffrey@tuckerellis.com

*Attorney for Defendant David Donadeo*

# TABLE OF CONTENTS

**Page**

I.    The Offense.................................................................1

    A.    DDR Technology Co...............................................1

    B.    Impact Global LLC ................................................3

    C.    Donadeo Returns To Ohio from California .............4

    D.    The Scheme Against the District is Discovered ...........5

II.    The Donadeos Relocate ........................................7

    A.    Wilmington, North Carolina .................................7

    B.    Berlin, Germany .................................................9

    C.    Lanzarote, Spain .................................................9

III.    Donadeo's Arrest .............................................. 10

IV.    Donadeo Accepts responsibility.................................. 11

V.    Sentencing Guidelines......................................12

    A.    Donadeo Did Not Obstruct Justice .........................12

    B.    The Loss Associated With Donadeo's Crimes Is Only $916,948.77 ....................................... 20

    C.    Donadeo Was a Minor Participant in the Conspiracy ................................ 23

VI.    David Donadeo, the Man .................................... 26

    A.    Donadeo Went to L.A. to Become an Actor, But Instead Became a Dedicated Husband and Father ................ 26

    B.    Donadeo Puts Family First ....................................28

    C.    Donadeo's Actions Were Life Altering and His Sons Are Suffering ................................ 29

    D.    Donadeo Is Being Punished, Yet He Continues to Do His Best ................ 30

    E.    Donadeo Tries to be a Good and Honest Person, and this Crime is a Result of Aberrant Behavior ....................31

i

**Page**

VII.  CONCLUSION...............................................................................................32

CERTIFICATE OF SERVICE ...........................................................................34

## INDEX OF CHARACTER LETTERS

Leslie Caldwell.........................................................................................Ex. 9

Julie Donadeo........................................................................................ Ex. 10

Sally and Lloyd Groves.........................................................................Ex. 3

Shelly Groves Borden ............................................................................Ex. 2

William Kalkreuth.................................................................................Ex. 11

Jayne Malpede, Ph.D...............................................................................Ex. 6

Dan Rupp...................................................................................................Ex. 7

Joyce and Ronald Rupp ....................................................................... Ex. 1

Ronald Rupp, Jr. ......................................................................................Ex. 8

Timothy Rupp............................................................................................Ex. 5

Gail Wetherell-Sack and Paul Sack ...............................................Ex. 4

Defendant David Donadeo ("Donadeo") submits the following information regarding the offense and factors which, pursuant to 18 U.S.C. § 3553, are relevant to this Court's determination of his sentence, as well as law and argument concerning the applicability of various adjustments and enhancements pursuant to the United States Sentencing Guidelines ("USSG").

## I.  THE OFFENSE

### A.  DDR Technology Co.

In late 2008 early 2009 as the Great Recession took hold over the world economy, the life Donadeo and his wife created in California began to quickly unravel. While the Donadeo's were joyfully expecting the birth of their second son, their family financial situation was becoming dire.  Donadeo's wife's staffing agency lost its biggest client to a competitor, causing Donadeo to become the sole financial provider for his family.  Not only would there be additional expenses associated with a second child, the Donadeo's adjustable rate mortgage was set to balloon to nearly $4,000 a month – an increase of almost $1,600 per month.  It was clear that Donadeo's modest income would simply not cover the cost of living in Los Angeles.  Donadeo knew foreclosure on the residence was inevitable.  To deal with the stress and anxiety, Donadeo started drinking alcohol.  It was in the midst of this situation, and Donadeo's constant drinking, that Dominick Palazzo ("Dominick") approached him about going into business together.

Donadeo and Dominick became friends while Donadeo was a student at the University of Akron.  Despite Donadeo's leaving Ohio, he and Dominick remained friends.  In late 2008, while Dominick was in California on business unrelated to Donadeo, Dominick and Donadeo met in person.  Dominick was aware of Donadeo's

financial situation and shared with Donadeo a proposal for a business opportunity that would allow him to make some much needed extra money while remaining in California. Dominick explained that his brother Joseph Palazzo ("Joseph"), as the director of information technology ("I.T.") for the Cuyahoga Heights School District (the "District"), was in charge of the purchasing and maintenance of all I.T. products and services for the District. Dominick further explained that while the District required I.T. services, Joseph's boss had decided that instead of hiring a full-time employee the District would outsource the work.

Dominick continued by informing Donadeo that since Joseph was in charge of the outsourcing, and was qualified to do the work himself, it was an opportunity for everyone to make extra money.  Dominick went on to explain that he and Joseph had partnered together to provide the services to the District through a third-party company two-years ago.  Joseph completed the work, prepared the invoice, submitted it to the District, and then collected the money.  Dominick further explained that this arrangement had allowed him and his brother not only to earn extra money, but to also get out of debt and build a life for themselves.

Dominick then offered to share this opportunity with Donadeo.  Dominick explained that all Donadeo needed to do was open a company so that Joseph could outsource the District's I.T. needs to that company.  Joseph would provide the services, prepare the invoices, ensure the District made payment, and then split the profits with him once payment was received.  Donadeo understood, Joseph would receive his hourly rate for his work, prior to calculating profit.  Accordingly, Donadeo understood Joseph would receive more money than him, but believed this to be the case because Joseph was actually performing services.

2

While Donadeo knew the arrangement presented a potential conflict of interest between Joseph and the District, Donadeo believed Dominick when he said there was nothing illegal about the business arrangement. Desperate to provide for his family and feed his addiction, Donadeo agreed to open a business and work with the Palazzo brothers. Accordingly, in January 2009 Donadeo incorporated DDR Technology Co. ("DDR") and DDR began offering I.T. services to the District. At this time Donadeo was living in California and believed all I.T. services furnished through DDR to the District were being provided by Joseph.

### B.     Impact Global LLC

After DDR was formed, while visiting Ohio from California for a family wedding, Dominick and Joseph approached Donadeo with a new business opportunity. *See* Ex. 1, Joyce and Ronald Rupp letter at 1; *see also,* Ex. 2, Shelly Groves Borden letter at 2-3. The Palazzo brothers explained they wanted to open an indoor playground in the Cleveland area. Donadeo was excited by the idea, as he was familiar with the concept and had been taking his oldest son to such a place in his neighborhood in California. The Palazzo brothers were aware that Donadeo's financial situation had worsened, and that he would be unable to invest money in the project. Nevertheless, they told Donadeo that he could become a partner through "sweat equity." He could relocate to Ohio and manage the day-to-day operations of the indoor playground business. As a family friend explains "David believed and trusted a friend (Dominic[k]) who offered him an exciting business opportunity. Unfortunately, the business opportunity was an illegal business venture." *See* Ex. 3, Sally and Lloyd Groves letter at 1-2.

Donadeo was initially concerned that if he relocated his family to Ohio to work on this new business full-time he would be unable to financially support his young family.

3

The Palazzo brothers assured Donadeo that the I.T. work Joseph was providing the District through DDR would provide sufficient income for Donadeo to sustain himself and his family, especially given the lower cost of living in Ohio.  Donadeo believed in the concept of the indoor playground, and thought it would provide the financial stability he and his family needed, so he agreed.  Accordingly, in May 2009 Dominick registered Impact Global, LLC ("Impact Global") in Ohio.

When Impact Global was registered, Donadeo was still residing in California, and he had limited initial involvement in the startup of Impact Global.  It was not until December 2009 that Donadeo was able to permanently relocate to Ohio.  Prior to relocating, Donadeo was able to negotiate with his mortgage holder a short sale of his residence.  The short sale allowed the Donadeos to avoid foreclosure and relocate to Ohio.  They left California nearly penniless.

### C.    Donadeo Returns To Ohio from California

Once Donadeo returned to Ohio, he began working full-time on opening the indoor playground.  While he had been in California, Donadeo had limited personal interaction with the Palazzo brothers, and when he made requests of them to provide him with information regarding the I.T. services being provided to the District, it was easy for the Palazzo brothers to ignore the request.  However, once Donadeo was in Ohio and working more closely with the Palazzo brothers, the Palazzo brothers were no longer able to conceal what was actually occurring from Donadeo.  Donadeo realized his business dealings with the Palazzo brothers were based on lies and deceit.  Donadeo now learned that no I.T. services were being provided to the District.  The money being stolen from the District had been put into his companies' bank accounts.  Donadeo's inability to continue to ignore the nature of the Palazzo's business that he was clearly a

4

part of, affected him deeply.  As Donadeo's parents' noted "his usual easy-going personality was not as prevalent and he seemed to be 'on edge.'"  *See* Ex. 1, Joyce and Ronald Rupp letter at 1.

Donadeo was at a loss as to what to do.  He had just moved his family to Ohio based upon what he thought was a wonderful legitimate business opportunity.  Donadeo desperately wanted the business to be legitimate, and once again began drinking heavily as an escape from the reality he was in.  Under the haze of alcohol, Donadeo continued to work with the Palazzo brothers to get their indoor playground, which they named "The Jump Yard," opened by March 2010.

Donadeo worked diligently, and The Jump Yard opened on schedule "and was turning into a successful business."  *See* Ex. 3, Sally and Lloyd Groves letter at 1.  It was also at this time Donadeo confronted the Palazzo brothers regarding their scheme involving the District.  When confronted, Joseph still told Donadeo that he was in fact providing services to the District.  However, Donadeo could not ignore what he was seeing, and knew that was not the case.  Instead of going to law enforcement or the District, Donadeo decided to escape the situation by leaving.  By the middle of 2010 he began to look for someone to buy his interest in Impact Global.

### D.     The Scheme Against the District is Discovered

In late 2010, Joseph's supervisor at the District retired, and Joseph's new supervisor initiated an internal investigation into Joseph's business practices and spending.  Joseph was placed on leave in or around December 2010. Joseph informed Donadeo that he was placed on leave and under investigation, but insisted that the investigation would turn up nothing.  Worst case scenario was that Joseph would lose his job and be required to pay the District back some amount of money.

The knowledge of the investigation caused Dominick to act in an unstable and unpredictable manner.  When Donadeo began working with Dominick in Ohio, Donadeo discovered Dominick's behavior could be erratic – he would appear normal one minute and then for no apparent reason become volatile – yelling and threatening.  Dominick's unstable and unpredictable behavior worsened; he became paranoid and suspicious of Donadeo's behavior.  In the past Dominick shared with Donadeo the fact he had placed spyware on office computers to monitor employees actions, and on occasion Donadeo witnessed Dominick listening in on other people's phone conversations.  Donadeo believed Dominick was spying on him and monitoring his activities as well.

Donadeo was concerned about Dominick's behavior, and that concern quickly escalated to fear.  Dominick worked to intimidate Donadeo.  Dominick would tell Donadeo that if anybody talks they will pay the price.  Dominick also told Donadeo that he had a cousin with ties to organized crime, and related a story of how his cousin went with him to Chicago and helped him collect on an unpaid  debt from a client.  Dominick implied that this cousin did something violent in order to make this client pay.  Donadeo believed Dominick was implying that he would exact a violent revenge on anyone that did not do as he said.

As the weeks went on, Dominick began to frighten Donadeo even more.  Dominick would call Donadeo on a regular basis to check on him -- to see where he was and what he was doing.  If Donadeo did not answer the phone, Dominick would call Donadeo's wife's phone and scream at her when asking where her husband was.  If his wife did not answer, Dominick would drive to their home and wait out front in his car.  Donadeo's wife expressed concern for her safety and the safety of their two young sons, ages 2 and 4.

6

In April 2011, the fear and stress Donadeo was experiencing took a physical toll on him, and he fell suddenly ill with a pancreatic infection which required hospitalization.  *See* Ex. 1, Joyce and Ronald Rupp letter at 1.  While he was in the hospital, Donadeo did not answer his phone, and when he did not answer for several days, Dominick became agitated and extremely paranoid.  Eventually Dominick was able to find Donadeo, and Dominick arrived at the hospital one day unannounced.  At that time, Dominick admitted to Donadeo that he thought Donadeo was talking to authorities, and was glad to hear that he was just in the hospital because that meant he did not need to reach out to his cousin.  This experience made it clear to Donadeo that he and his family were not safe.  Donadeo's fear was shared by his wife, who had witnessed Dominick's aggressive behavior on her own, and had experienced it at times herself.  Even if Donadeo did not cooperate, Donadeo feared Dominick could one day presume he was cooperating and seek revenge.  Donadeo believed the only way he could keep his family safe was to leave Ohio and put physical distance between them and Dominick.

## II.     THE DONADEOS RELOCATE

### A.     Wilmington, North Carolina

After his hospitalization in April 2011, Donadeo's fear of Dominick caused him to prepare to relocate his family out of state.  To cut-off all ties with the Palazzo brothers, Donadeo sold his interest in The Jump Yard for what he could get quickly, and in fact Donadeo never received payment for the full purchase price.  Donadeo relocated his family to Wilmington, North Carolina in June 2011, and intended to make North Carolina his home.  As one family friend explained when she learned about the move "I was shocked a little, but I knew Julie and David had a great work initiative and they

must have an opportunity.  I had heard that they bought a bar and would be staying down there."  Ex. 2, Shelly Groves Borden letter at 3.

The decision to relocate to North Carolina was Donadeo's first attempt to protect himself from the Palazzo brothers, and any potential retaliation.  Donadeo wanted to distance himself from them, and keep his whereabouts a secret from them. It is for that reason Donadeo refused to provide the Palazzo brothers with his new address or even the name of the city where he was residing.  As Donadeo's parents explain, once settled in North Carolina "Dave seemed relieved to be away from Dominick and what he and Julie described as his 'aggressive personality.'"  *See* Ex. 1, Joyce and Ronald Rupp letter at 2.  Donadeo's relocation to North Carolina pre-dated any contact Donadeo had with the FBI.  Donadeo's first contact with the FBI was on the day a search warrant was executed on his former residence and The Jump Yard-- July 7, 2011.  As Donadeo certainly did not have advanced knowledge concerning the search warrants, the search warrants played no role in his families' decision to move to North Carolina.

It should also be noted that during the execution of the search warrants, despite his residing in North Carolina, Donadeo assisted an FBI agent during the search of The Jump Yard.  The FBI agent asked for the combination to an Automated Teller Machine, which Donadeo provided.  Donadeo also received a message from an FBI agent while his house was being searched.  He returned the phone call and was told the case agent was unavailable and would contact him later if necessary.

Following the execution of the search warrants, Donadeo's anxiety grew.  He believed that despite the distance between him and Dominick, that Dominick was still monitoring him through some form of electronic monitoring.  Donadeo also believed that his willingness to speak to FBI agents during the search increased the risk

8

Dominick would retaliate against him. "David's personality and drive to protect his family influenced him making unfortunate mistakes that he deeply regrets." *See* Ex. 4, Gail Wetherell-Sack and Paul Sack letter at 2.

### B. Berlin, Germany

Donadeo's mother-in-law lived in Berlin, Germany, and had taken ill. Donadeo and his wife had already discussed eventually moving to Berlin so that she could be there for her mother. Prior to the move, Donadeo's wife traveled from the United States to Germany to care for her mother while she underwent chemotherapy and radiation for cancer. As an only child it was important for Donadeo's wife to be there for her mother and have her children spend time with her before she died.[1] Accordingly, the Donadeos, as a family, travelled to Berlin, Germany in August 2011. When leaving the United States to travel to Germany all members of the family used their current passports. The Donadeo's did not hide while in Germany. They were staying in the most obvious place, where Donadeo's mother-in-law lived. The Donadeos used their bank issued ATM card, and the Donadeo's children were registered in a local school. David Donadeo, even applied for, and received, his European Union Residency Card, and enrolled in and attended German language classes sponsored by the German Government. At all times the Donadeos used the names appearing on their passports. The Donadeos took no steps to conceal their identities.

### C. Lanzarote, Spain

After living in Germany for a few months, the Donadeo's decided to look for a less expensive and more family-friendly place to live. Later a friend of Donadeo's wife told

---

[1] Donadeo's wife, Julie Donadeo, was born in Germany and retained dual citizenship with Germany and the United States.

the Donadeos about Lanzarote, Spain, where the friend lived.  This friend described

Lanzarote as a wonderful place to raise children.  He promised to help the Donadeos

find a place to live and Donadeo's wife a job.  Based upon what they heard about

Lanzarote, the willingness of a friend to offer them assistance and support, and

Donadeo's wife's ability to easily travel to Germany to attend to her mother's needs the

Donadeos, in April 2012, still a year before Donadeo was indicted, moved to Spain.[2]  In

discussing his intentions to move with his parents' Donadeo explained "there was some

trouble with Dominick and Joseph Palazzo and [David and his wife] were afraid."  *See*

Ex. 1, Joyce and Ronald Rupp letter at 2.

The Donadeos travelled to Spain by train and boat, and utilized their passports

during the journey.  Donadeo's wife entered into a lease using her married name and

obtained a job.  The children were enrolled in school using their names.  At all times

Donadeo used his legal name.  At no time did any of the Donadeos attempt to conceal

their identity.  As one of his brothers explains, "[m]y brother got himself into a situation

that he could have avoided[, and] . . . [h]e made a mistake out of pure instinct to do what

he thought was the best for his family."  *See* Ex. 5, Timothy Rupp letter at 1.

### III.    DONADEO'S ARREST

On September 5, 2016, Donadeo was arrested.  On that morning Donadeo took

his dog out for a walk and was surrounded by law enforcement.  Donadeo was asked his

name, and he answered – "David Donadeo."  He was promptly arrested.  Donadeo was

transported to Madrid, Spain.  It took three months for the writ supporting the

---

[2] Donadeo's mother-in-law suffered from recurring cancer.  In Spring 2016 she suffered
with pneumonia which required hospitalization.  Upon release, she suffered a severe
stroke rendering her hospitalized and very ill.  She then suffered two more strokes, and
dies in July 2016.

extradition to be filed by prosecutors. Then because of other pressing business before the court, Donadeo did not have a hearing until February 2017. Donadeo was only before the court in Madrid once. He did not contest his extradition back to the United States. Donadeo was originally told he would be transferred to the custody of the U.S. Marshalls in approximately two weeks, but the transfer did not occur until May 2017. When Donadeo asked about the delay in the transfer, he was told they were waiting on the U.S. Marshalls.

Accordingly, Donadeo was incarcerated for 8 months in Spain. The length of this incarceration was not caused by Donadeo's actions following his arrest. In fact, Donadeo wanted to return to the United States as quickly as possible following his arrest so that the legal process could begin. Because this 8 months of incarceration took place oversees, the Bureau of Prisons cannot count this lengthy period of time as time served. Accordingly, in sentencing Donadeo, he requests the 8 months of time served while in Spain be taken into account.

## IV.    DONADEO ACCEPTS RESPONSIBILITY

Donadeo fully accepts responsibility for all of his actions, and is remorseful for the harm he caused the District. "David [has] experienced periods of depression and sincere regret related to the decision[s] he had made years earlier out of fear, rather than rationality." *See* Ex. 6, Jayne Malpede letter at 2. Donadeo understands that his fear and anxiety over his family's personal financial situation is no excuse for allowing himself to be used by others to commit fraud. Donadeo in his desperation allowed himself to believe something he knew was probably too good to be true. His friend had provided him the financial solution to his immediate problems. Donadeo recognizes

this is no excuse for what he did. No amount of desperation can justify taking part in a scheme to defraud.

Donadeo admits that he failed to do what he knew was right. After he returned to Ohio in December 2009, Donadeo could no longer ignore the fraud the Palazzo brothers were committing, and he knows he should have withdrawn and come forward. Donadeo accepts responsibility for not doing so.

Once the District's investigation started and Dominick Palazzo became threatening, Donadeo admits he should have gone to the authorities. However, Donadeo was scared and focused solely on protecting himself and his family. Donadeo thought he could only escape the Palazzo brothers by selling his interest in Impact Global and moving out of state. After the move, Donadeo was still fearful, but that fear does not justify his avoidance of the situation by leaving the country.

Despite his desire to protects his family, Donadeo knows he let his family, especially his sons, down, but by accepting responsibility for his actions, Donadeo is demonstrating how to be honest about one's misdeeds, how to accept responsibility for them, and how to properly make amends.

## V. SENTENCING GUIDELINES

### A. Donadeo Did Not Obstruct Justice

A two-level enhancement for obstruction of justice pursuant to USSG § 3C1.1 is not appropriate. Donadeo's leaving the United States in August 2011 prior to his indictment (April 11, 2013) or arrest (September 5, 2016) is not conduct deemed obstruction of justice by the U.S. Sentencing Commission or the Sixth Circuit. To support the application of the two-level enhancement, the Presentence Investigation Report ("PSI") asserts that "by fleeing from the United States subsequent to execution of

search warrants, in addition to remaining an international fugitive for 3 years and 5 months while mindful of the Indictment pending against him and others, demonstrated a substantial degree of planning, obstructed (or at minimum attempted to obstruct) the administration of justice, and is the type of conduct to which this adjustment applies." *See* ECF #46, PSI at ¶ 41.  However, the application notes to USSG § 3C1.1. and the applicable case law do not support an obstruction of justice enhancement for fleeing post execution of search warrants but prior to indictment.  *See United States v. Sanchez,* 928 F.2d 1450 (6th Cir. 1991) *abrogated on other grounds by United States v. Jackson-Randolph,* 282 F.3d 369 (6th Cir. 2002).

USSG § 3C1.1 application note 5 provides in relevant part:

> **Examples of Conduct Ordinarily Not Covered. –**
> Some types of conduct ordinarily do not warrant application of this adjustment . . . .
>
> * * *
>
> (D) avoiding or fleeing from arrest (see, however, § 3C1.2) (Reckless Endangerment During Flight) . . . .

Accordingly, avoiding arrest does not alone qualify for an obstruction of justice enhancement.

The Sixth Circuit in 2006 had an opportunity to discuss the applicability of USSG § 3C1.1 in relation to avoiding arrest.  *United States v. Spates,* Case No. 04-4515, 162 Fed. Appx. 592 (6th Cir. Jan. 25, 2006).  *Spates* involved a defendant charged in a six count indictment (five counts embezzlement and one count false statements).  After he was indicted, a pretrial services officer personally delivered a notice of arraignment to the defendant at his residence.  Despite the fact the defendant answered the door, he told the officer he was not the defendant.  The officer handed him the notice, and

informed him of the date of arraignment.  The defendant did not attend the arraignment, and as a result the court issued an arrest warrant.  Before the warrant was executed, the defendant left the state, moving his family to a home owned by his mother-in-law in Alabama.  The defendant was subsequently arrested.  *Id*.

*Spates* found the obstruction of justice enhancement appropriate.  *Spates* explained that one of the examples of conduct warranting the enhancement is failure to appear as ordered for a judicial proceeding.  *Id*. at *596 citing USSG § 3C1.1 cmt. n. 4(e).  Additionally, *Spates* found that given the specific factual circumstances, the enhancement was appropriate: (1) after the grand jury handed down the indictment, an arraignment was scheduled; and (2) a pretrial services officer personally informed the defendant of the arraignment and tried to interview him, but he lied to the officer about who he was.  Accordingly, despite having knowledge of the criminal charges returned against him, and the specific date for his initial appearance,  the defendant elected to mislead the authorities rather than appear in court.  In addition to intentionally lying to authorities and missing his arraignment date, he also moved his entire family from Ohio to Alabama "several weeks after he received notice of his arraignment."  *Id*.  The facts warranting the enhancement were (1) failing to appear in court after personally receiving notice of the required appearance, and (2) intentionally lying to authorities regarding one's identity.

In concluding the obstruction of justice enhancement was warranted, *Spates* specifically distinguished the matter from two cases, *United States v. Alpert,* 28 F.3d 1104 (11th Cir. 1994) and *Sanchez*, 928 F.2d 1450, that determined an obstruction of justice enhancement was not warranted.  The distinguishing factor presented in *Alpert* and *Sanchez* was that the defendants were not "under arrest or subject to charges, nor

had any arraignment hearing been scheduled." *See, Spates,* 162 Fed. App'x at 597, n.10. *Spates* found a bright-line distinction between actions taken while a criminal investigation is underway, but no charges have been filed, and actions taken after a defendant was indicted, personally made aware of the charges filed against him, and advised of a court appearance date. *Id.*

*Alpert* and *Sanchez* demonstrate that an obstruction of justice enhancement is inappropriate in this case because Donadeo left the country during the early stage of an investigation.  Indeed, no indictment was issued against Donadeo or others until April 2013, some 20 months after the Donadeos left the United States.

The following analysis of *Sanchez* and *Alpert* further supports the finding that Donadeo's actions in moving first to Germany and later to Spain pre-indictment do not equate to Donadeo obstructing justice.  *United State v. Sanchez* involved two defendants abandoning their apartment and fleeing the area after the arrest of a co-conspirator. The arrest took place after one of the defendants had been taken into custody, questioned, and released, and the execution of a search warrant.  *Sanchez* recognized that the defendants abandoning their apartment "[made] their apprehension by law enforcement officials more difficult once arrest warrants had been issued" and that "the defendants undoubtedly abandoned their known residence in an attempt to avoid being arrested." *Sanchez*, 928 F.2d at 1458-1459.  However, the defendants did not have a duty to remain in their residence after the arrest of their co-conspirator, and the application note to USSG § 3C1.1 clearly states "avoiding or fleeing from arrest" is not obstruction of justice.  *Id.*  Accordingly, *Spates* found that the defendants should not have received a two-level enhancement for obstruction of justice for merely abandoning their apartment and fleeing.

The second case referenced in *Spates* is *United States v. Alpert*.  *Alpert* held that the trial court erroneously applied the two-level obstruction enhancement.  28 F.3d at 1107.  *Alpert* involved defendants leaving town in the middle of plea negotiations without notifying the Government, and using phony names after they fled.  *Id*.  *Alpert* explained:

> [t]his Court is bound by the Guidelines, including the commentaries that interpret or explain a guideline.  *Stinson v. United States*, 508 U.S. 36, –––, 113 S. Ct. 1913, 1915, 123 L. Ed. 2d 598 (1993).  **The commentary accompanying § 3C1.1 states plainly that avoiding or fleeing from arrest does not warrant an enhancement.**  USSG § 3C1.1, comment.  (n. 4(d)).  **This circuit and other circuits have recognized that successfully avoiding arrest, alone, does not warrant an enhancement for obstruction of justice.**  *United States v. Burton*, 933 F.2d 916, 918 (11th Cir. 1991) (holding that the obstruction enhancement does not apply to flight from law enforcement officers about to make an arrest); *United States v. Madera–Gallegos*, 945 F.2d 264, 266–67 (9th Cir. 1991) (holding obstruction enhancement inapplicable to defendants who successfully avoided arrest for nine months, knowing that Government agents were searching for them, but noting that "flight, coupled with other 'obstructive' conduct, may justify the § 3C1.1 enhancement"); *United States v. Sanchez*, 928 F.2d 1450, 1459 (6th Cir. 1991) (holding obstruction enhancement inapplicable when "defendants undoubtedly abandoned their known residence in an attempt to avoid being arrested" after learning of the arrest of a co-conspirator).
>
> \*\*\*
>
> [*Alpert*] conclude[d] that the § 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest, without more.  Such persons do not face a two-level enhancement for failing to remain within the jurisdiction or for failing to keep the Government apprised of their whereabouts during its pre-indictment investigation.

*Id*. (footnote omitted) (emphasis added).

Donadeo's relocating his family to North Carolina in June 2011 was done in an attempt to keep his family safe from the Palazzo brothers.  Donadeo believed Dominick was threatening him and his family.  Dominick repeatedly told Donadeo, in a threatening manner, if anybody talks they will pay the price; he checked on him repeatedly to determine where he was and what he was doing; he randomly showed up at his house; and, he called Donadeo's wife screaming to know where Donadeo was. Donadeo was aware that Dominick had previously engaged in electronic monitoring of employees, and Donadeo honestly believed Dominick was monitoring him to determine if Donadeo was cooperating. In fact, shortly before the move, when Donadeo was hospitalized and not in contact with Dominick, Dominick searched for him, found him, and came to the hospital unannounced making it clear once again that if he cooperated with authorities he would be harmed.  In addition, Donadeo's wife expressed concern regarding her safety and the safety of their young sons who were 2-years old and 4-years old at the time.

It must also be noted that the move to North Carolina pre-dated any contact Donadeo had with the FBI, and that while in North Carolina Donadeo spoke to an FBI agent during the search of The Jump Yard and assisted him by providing certain information.  Donadeo also attempted to return a message from an FBI agent that was left for him while his house was being searched.  Accordingly, the move to North Carolina was pre-planned and was not done to flee from authorities.

While in North Carolina, Donadeo willingly spoke to the FBI.  At that time there was no warrant for his arrest, and Donadeo became concerned that his willingness to speak with the FBI would cause Dominick to follow through on his threats.  This

17

heightened fear led Donadeo to leave the country with his family and travel to Germany where his wife was from and where his mother-in-law lived.

Even if leaving the country in August 2011 was a result of the execution of the search warrants, and concern regarding the pending investigation and a potential future indictment, such action cannot be viewed as obstruction of justice; there was no active warrant for his arrest then or prior to the issuance of an indictment in April 2013.  *See, Sanchez, supra*.  Donadeo left the United States one year and eight months prior to being charged with any offense. "[A]ctions, which amount to little more than 'simply disappearing to avoid arrest,' . . . fall short of what [the court] believe[s] the Sentencing Commission contemplated in prescribing the enhancement for obstruction of justice." *United States v. Bliss*, 430 F.3d 640, 649 (2d Cir. 2005).

Since Donadeo left the United States in August 2011, before he was charged and arrested, his actions do not amount to obstruction of justice.  Furthermore, none of Donadeo's actions while oversees can be viewed as obstructive behavior.  While it must be noted that the use of an alias while hiding from law enforcement does not equate to obstruction of justice, Donadeo never used an alias while abroad.  *See Bliss,* 430 F.3d at 649; *Alpert,* 8 F.3d at 1107.  The Donadeos traveled to Germany using their current passports, and stayed in the area where his mother-in-law resided.  The Donadeo's did not hide – they used their bank issued ATM card, the Donadeo's children were registered in a local school, and at all times the Donadeos used the names appearing on their passports.  David Donadeo, even applied for, and received, his European Union Residency Card, and enrolled in and attended German language classes sponsored by the German Government.

While in Germany, the Donadeos decided not to return to the United States as they continued to fear Dominick, and they believed that if the investigation was continuing the danger they faced would only increase.  However, the Donadeos did not like the idea of raising their children in Berlin, as they felt it was not a hospitable environment for children.  Accordingly, the Donadeos elected to move to Lanzarote, Spain after a friend of Donadeo's wife told them it was a great place to raise children, and how he would help the Donadeos find a place to live and Donadeo's wife a job. Accordingly, in April 2012, still a year before Donadeo was indicted, the Donadeo's moved to Spain.  They travelled to Spain by train and boat, and utilized their passports during the journey.  Donadeo's wife entered into a lease using her married name and obtained a job.  The children were enrolled in school using their names.  At all times Donadeo used his legal name David Donadeo.  At no time did any of the Donadeos try to conceal their identity.

On September 5, 2016, Donadeo was arrested.  On that morning Donadeo took his dog out for a walk and was surrounded by law enforcement.  Donadeo was asked his name, and he answered – "David Donadeo."  He was promptly arrested.  Donadeo was transported to Madrid, Spain.  It took three months for the writ supporting the extradition to be filed by prosecutors.  Then because of other pressing business before the court, Donadeo did not have a hearing until February 2017.  Donadeo did not contest the extradition to the United States.  Donadeo was originally told he would be transferred to the custody of the U.S. Marshalls in approximately two weeks, but the transfer did not occur until May 2017.  When Donadeo asked about the delay in the transfer, he was told they were waiting on the U.S. Marshalls.

All of Donadeo's moves took place before he was charged, and at most can be argued as an attempt to avoid arrest, which simply put is not conduct that warrants the obstruction of justice enhancement.  Donadeo at all times used his name.  Donadeo took no steps to conceal his identity, and once arrested Donadeo elected not to fight extradition back to the United States.  Donadeo did nothing to prevent the Spanish authorities from arresting him earlier.  Donadeo's arrest by Spanish authorities in September 2016 outside his residence establishes that Donadeo did nothing to hide his identity and always lived his life in an open and transparent manner that would have allowed his apprehension earlier.  Donadeo did nothing to warrant the application of § 3C1.1.

### B.     The Loss Associated With Donadeo's Crimes Is Only $916,948.77

The loss amount Donadeo is accountable for is the $916,948.77 loss caused by conduct within the scope of the jointly undertaken criminal activity he agreed to. Donadeo does not contest that the total loss experienced by the District as a whole was $2,615,927, but challenges the determination that he is accountable for the entire loss amount to the District.  Donadeo never agreed to participate in the criminal activity involving the Shell Vendor Corporations for which he never had an ownership interest – Forte Promotions, Laptops, and Macwin-Protocol.  He has no independent knowledge regarding activities involving those Shell Vendor Corporations.  Accordingly, the only loss amount properly attributable to Donadeo is $916,948.77, the funds the district paid to DDR and Impact Global.

As application note 3(A) of USSG § 1B1.3 explains, a defendant is accountable for the conduct of others only if the following three conditions are met, and the conduct was otherwise:

> (i) within the scope of the jointly undertaken criminal activity;
>
> (ii) in furtherance of that criminal activity; and
>
> (iii) reasonably foreseeable in connection with the criminal activity.

USSG § 1B1.3, cmt. n. 3(A).

Accordingly, "a defendant *is not* necessarily responsible for all acts of other conspirators that are reasonably foreseeable and 'in furtherance of the conspiracy.' Rather, for sentencing purposes, a defendant is responsible for all acts of other conspirators that are reasonably foreseeable and within the scope of 'jointly undertaken criminal activity.'" *United States v. Jordan,* Case No. 00-1135, 20 Fed. Appx. 319, 323 (6th Cir. Sept. 18, 2001)(emphasis original); *see also United States v. Jenkins,* 4 F.3d 1338, 1346 (6th Cir. 1993)("[C]onduct for which a defendant is 'otherwise accountable' includes conduct of others in furtherance of jointly undertaken criminal activity that was reasonably foreseeable by the defendant."). "[T]he phrase 'jointly undertaken criminal activity' is significantly narrower than the phrase 'the conspiracy.'" *Id*.

To determine what is jointly undertaken criminal activity, "the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement)" must be determined. USSG § 1B1.3, cmt. n. 3(B). There must be "*particularized* findings with respect to both the scope of the defendant's agreement *and* the foreseeability of his co-conspirators' conduct before holding the defendant accountable for the scope of the

entire conspiracy." *United States v. Woodside,* Case No. 15-5346, 642 F. App'x 490, 497 (6th Cir. Feb. 10, 2016) quoting *United States v. Campbell,* 279 F.3d 393, 400 (6th Cir. 2002) (emphasis original). Donadeo admits to entering into an agreement with the Palazzo brothers to undertake a scheme to defraud the District utilizing DDR and Impact Global. However, Donadeo did not agree to participate in a scheme to defraud the District utilizing Forte Promotions, Laptops, and Macwin-Protocol.

The Government contends that Donadeo was aware of the scheme involving Forte Promotions, Laptops, and Macwin-Protocol, and that this awareness makes him accountable for the losses associated with those entities. However, even if Donadeo was aware of the Palazzo brothers' scheme involving Forte Promotions, Laptops, and Macwin-Protocol, "[t]he 'mere fact' that [Donadeo] 'was aware of the scope of the overall operation [is] not enough to hold him accountable for the activities of the whole operation." *Woodside,* 642 F. App'x at 497 quoting *Campbell,* 279 F.3d at 400. Donadeo had no control or knowledge regarding the Palazzo brothers' business endeavors involving Forte Promotions, Laptops, and Macwin-Protocol. Donadeo did not need to, nor did he, acquiesce to such activities. Accordingly, the only conduct Donadeo may be held accountable for is the conduct involving DDR Technology and Impact Global, and the loss amount attributable to the District's payments to those entities – $916,948.77.

The acts involving Forte Promotions, Laptops, and Macwin-Protocol simply put were never part of Donadeo's agreement with the Palazzo brothers. It should be noted, the charges against Donadeo only specifically reference three Shell Vendor Corporations – Macwin-Protocol, DDR, and Impact Global (referred to as SV Company #1 in the Indictment). *See* ECF #3, Indictment. Even if Donadeo could be held accountable for the losses attributable to Macwin-Protocol caused after he entered the conspiracy in

22

January 2009, which he cannot, the loss amount would only be $1,148,536.70[3] an amount still within the range of more than $550,000 - $1,500,00 which warrants a 14-level increase and not the 16-level increase assessed in the PSI.

The loss amount suffered by the District that can be attributable to Donadeo is only $916,948.77, but even if the loss caused by Macwin-Protocol could be attributed to Donadeo the loss would still be under $1,177,115.90.  Accordingly, Donadeo's should only receive a 14-level increase for loss amount.

### C.     Donadeo Was a Minor Participant in the Conspiracy

Donadeo should receive a two-level downward adjustment for being a minor participant in the criminal activity, as did Boyles, a co-defendant that served in an identical role, in a separate scheme.  A minimal participant is one "who [is] plainly among the least culpable of those involved," while a minor participant is one "who is less culpable than most other participants, but whose role could not be described as minimal."  USSG § 3B1.2, cmt. 4–5; *see also United States v. Henderson*, 307 Fed. App'x 970, 983 (6th Cir. 2009). Donadeo may not qualify as a minimal participant, but since he is as culpable as Boyles and less culpable than the Palazzo brothers, he does qualify as a minor participant.  *See United States v. Ivery,* 999 F.2d 1043, 1047 (6th Cir. 1993) (upheld two-level downward adjustment where defendant shared an identical level of culpability as one co-defendant, but was less culpable than two co-defendants).

Donadeo, like Boyles, clearly has less culpability than the Palazzo brothers. Boyles and Donadeo were each utilized similarly by the Palazzo brothers in separate

---

[3] The PSI provides for the total loss amount associated with each entity, and not the loss amount for the time period Donadeo was working with the Palazzo brothers. Accordingly, while the PSI states that the loss associated with Macwin-Protocol was $260,167.22, only $231,587.96 was received during the relevant time period.

schemes involving distinct entities, yet admittedly against the same victim.  It was the

Palazzo brothers that fully understood and appreciated the scope and structure of the

conspiracy made up of different schemes that utilized Boyles and Donadeo.

The decision as to whether to apply a minor participant adjustment is fact based,

and the Court should consider the following factors:

> (i)  the degree to which the defendant understood the
> scope and structure of the criminal activity;
>
> (ii)  the degree to which the defendant participated in
> planning or organizing the criminal activity;
>
> (iii)  the degree to which the defendant exercised decision-
> making authority or influenced the exercise of
> decision-making authority;
>
> (iv)  the nature and extent of the defendant's participation
> in the commission of the criminal activity, including
> the acts the defendant performed and the
> responsibility and discretion the defendant had in
> performing those acts;
>
> (v)   the degree to which the defendant stood to benefit
> from the criminal activity.

USSG § 3B1.2, cmt. 3(C).

Donadeo did not have a complete understanding of the scope and structure of the

criminal activity.  While Donadeo was aware of the activities of DDR and Impact Global,

he was unaware of the activities of the other Shell Vendor Companies and their use

against the District.  Donadeo did not participate in the planning or organizing of the

criminal activity – he followed instructions.  Donadeo did not exercise decision-making

authority or take part in making decisions; he took direction from the Palazzo brothers.

Donadeo performed the acts he was told to perform, and had no discretion.  Donadeo

kept the money the Palazzo brothers told him he could keep, thus keeping his personal

benefit lower.  Basically, Donadeo was tasked with performing certain concrete tasks as

directed by the Palazzo brothers.  In large measure, Donadeo was utilized to perform the legitimate operations of The Jump Yard.

The Government may assert that Donadeo's role was larger than Boyles' roles and therefore cannot be considered a minor participant, yet this contention is not born out by the facts.  Donadeo and Boyles performed comparable roles in different Shell Vendor Companies.  The only true differences between Donadeo and Boyles is that Donadeo was involved with two businesses, one of which managed and operated an actual functioning indoor playground.  Boyles was involved in one business, Boyles entered the conspiracy at least 10 months prior to Donadeo, and Boyles failed to pay taxes on the illegal proceeds he received from the scheme.

As noted in the Indictment Donadeo and Boyles served similar roles in the conspiracy:

- Joe Palazzo delivered checks made payable to the respective business to Donadeo and Boyles;

- Donadeo and Boyles established bank accounts in the names of businesses (per the Indictment Dominick Palazzo opened the account for Impact Global); and

- Donadeo and Boyles deposited the District checks into the respective business account.

ECF #1, Indictment at ¶¶12-14; 49.

The Government may argue that Donadeo is not entitled to the minor participant adjustment, because he was involved in two companies which caused a greater loss than the one company Boyles was involved with.  Importantly, Donadeo's involvement with Impact Global's legitimate business endeavor of managing an indoor playground created the perception of his having a more active role in the criminal activity.  As for which business entity received more money from the District, that was caused by a

decision made by the Palazzo brothers, not Donadeo. Donadeo did not determine which entity would bill the District at what time and for what amounts. Those were decisions made by one or both of the Palazzo brothers. As for Donadeo's role managing The Jump Yard, such work was not criminal in nature, and does not alter his role in the criminal activity. In addition, it should be noted that Donadeo paid taxes on all money he received from the scheme, while Boyles did not.

Since Boyles and Donadeo were acting in the identical capacity for the businesses they operated with the Palazzo brothers, and had similar limited knowledge regarding the other businesses, they should be treated in an identical manner as to role in the offense. The facts support a finding of minor participant, and as the Court previously determined Boyles had a minor role in the scheme in which he was involved, for consistency in sentencing Donadeo should likewise receive the same departure for minor participant. USSG § 3B1.2, cmt. 3(C).

## VI.   DAVID DONADEO, THE MAN

### A.   Donadeo Went to L.A. to Become an Actor, But Instead Became a Dedicated Husband and Father

Donadeo was born and raised in Canton, Ohio as part of a close-knit family. Donadeo was the youngest of four boys. While his three older brothers are close in age, there are 6-years separating Donadeo and his closest brother. Upon graduating high school, Donadeo began attending college at the University of Akron where he was pursuing a business degree. While Donadeo was attending college he did some modeling work for an agency owned by Dominick. It was at that time Dominick and Donadeo became friends.

26

As Donadeo and Dominick were friends, Dominick knew that while Donadeo was doing some modeling, Donadeo also had aspirations of becoming an actor.  "David is the kind of person who is very kindhearted, loyal and trusting of his friends.  He was convinced by Dominick that he should go to Hollywood and become an actor." *See* Ex. 1, Joyce and Ronald Rupp letter at 1.  So in 1996, at 22-years old, Donadeo dropped out of college and moved to Hollywood.  While Donadeo landed a few small parts, like most aspiring actors he did not find success.  It was while trying to make it as an actor that Donadeo legally changed his name from David Alan Rupp to David Anthony Donadeo.  He selected the name, in part, to honor his late maternal grandfather Anthony Donadeo. *Id.*

Donadeo tried to become a successful actor, but it did not work out.  In 2001, he took a job as a marketing representative in the Los Angeles area for a company based out of Chicago, Illinois.  At a national meeting for the company, Donadeo met Julie, the woman who would become his wife.  *See* Ex. 7, Dan Rupp letter.  When Donadeo and Julie met they hit it off immediately and became good friends, despite living in different cities.  As she got closer to Donadeo, Julie shared with him that she was married to a man that was physically and mentally abusive, a man she married at a young age.  This abuse led Julie into developing severe depression and an eating disorder.  "[Julie] credits Dave with giving her the support and strength needed to get out of her abusive marriage and seek counseling on her eating disorder." *Id.*

Once Julie ended her abusive marriage, she eventually moved to California to be with Donadeo.  They married in 2005, and in November 2006 they had their first son Luca, and in February 2009 they had their second son Shea.  As discussed above, in late 2008 and early 2009, the Donadeos began to struggle financially and Donadeo began to

drink heavily to deal with the stress.  It was while filled with dread over losing the family home, and a fear of not being able to provide for his family that Donadeo went into business with the Palazzo brothers.

### B.  Donadeo Puts Family First

After marriage and becoming a father, Donadeo dedicated himself to the well-being of his family.  "[Donadeo] is a kind and gentle person whose focus is his family." *See* Ex. 8, Ronald Rupp, Jr. letter.  "David [is] a true family man who would do anything to make sure his family was happy."  *See* Ex. 5, Timothy Rupp letter at 1.

David's love of family extends to close friends he considers family.  A friend who described her relationship with Donadeo as being more like siblings then friends, explains that even when living in different states, Donadeo was there for her.  She explains that "[w]hen I was in charge of an auction in 2003 (I was in transition from being a teacher to Creative Designer at the time), David extended his help by making a donation for the auction all the way from California.  He knew how important it was for me to succeed and make an impact at my job and was supportive, as David always was through and through."  Ex. 2, Shelly Groves Borden letter at 2.

Donadeo's desire to protect his family led him to make horrible decisions.  Donadeo made a decision to go into business with the Palazzo brothers out of fear for the financial well-being of his family.  He made the initial decision while under the haze of alcohol.  Despite the additional money, the Donadeos financial prospects were not improving, thus when Donadeo was approached regarding a second business venture that would bring him back home to Ohio, he jumped at it.  Donadeo was so focused on his family's personal situation he did not consider the consequences of his actions on either the victim or his family.  Once the reality of the choices he made set in, Donadeo

could not easily exit the situation, and once again he made decisions on what he thought best for his family, focusing only on their safety and security. "[Donadeo and his wife's] highest priority has always been the well being[sic] and positive growth of their sons." *See* Ex. 8, Ronald Rupp, Jr. letter. The decision to leave the United States and eventually to settle in Spain were decisions made by Donadeo only with the well-being of his sons in mind. "David had been very fearful and made 'difficult' decisions' that he thought were necessary to protect himself and his family . . . ." *See* Ex. 6, Jayne Malpede letter at 1.

### C. Donadeo's Actions Were Life Altering and His Sons Are Suffering

"David appreciates that his choices were life-changing for his entire family . . . ." *See* Ex. 9, Leslie Caldwell letter at 2. While Donadeo's wife mentions "that [Donadeo's] absence leaves a gaping hole in [her] life and heart" she explains that "no loss of [hers] could compare to that his sons are feeling." *See* Ex. 10, Julie Donadeo letter at 1. Donadeo was a hands-on father, and "being separated from their father is more than difficult for them." *Id.* Luca, the 10-year old is better at expressing his feelings about missing his father then his younger brother, and it is obvious "he is anxious and worried, and he does not like to sleep alone." *See* Ex. 9, Leslie Caldwell letter at 2. But despite being able to express his emotions, after his father was arrested, Luca began to vomit randomly and frequently for no physical reason. *See* Ex. 10, Julie Donadeo letter at 1. It is believed that the vomiting is a way for Luca to gain control when he feels anxious, something that he feels often because of the separation from his father. *Id.* The 8-year old, Shea's reaction to the sudden loss of his father has caused him to be confused and hurt which has resulted "in angry outbursts and strong defiance." *Id.*

Basically, because Shea cannot express his emotions he "acts out." *See* Ex. 9, Leslie Caldwell letter at 2. Donadeo took actions he deemed necessary to protect his children, and now those actions are causing them great harm. The knowledge of what his actions have cost his children causes Donadeo great suffering and personal pain.

Donadeo's decision to protect his family by moving them to Spain, has resulted in them remaining in Spain where they have "stability and consistency." *See* Ex. 10, Julie Donadeo letter at 2. Donadeo knows he will have limited ability to see his sons, and does not know when he will be able to. His heart aches with this knowledge.

### D. Donadeo Is Being Punished, Yet He Continues to Do His Best

Donadeo's love and dedication to his children continues despite his incarceration. "He calls them daily, but I know that he is heartbroken that he can't be with them in person." *See* Ex. 1, Joyce and Ronald Rupp letter at 2. His sister-in-law was in Spain and witnessed these calls, and explained "[a]lthough the calls were short, they were proof to me of David's continuing devotion to his children and his desire to be a daily part of their lives." *See* Ex. 9, Leslie Caldwell letter at 1.

Donadeo has been incarcerated since September 2016, with the first 8 months spent in Spain, so not qualifying for calculation as time served once sentenced. Donadeo has used that time to the best of his ability. He has focused on writing screenplays. Some of the screenplays he writes specifically for his wife and sons. "It does not matter whether David's screenplays ever make it off the typed page. What is important is that David is making constructive use of his time in prison and is doing it in a way that bring[s] his boys and his family a little bit of joy." *See* Ex. 9, Leslie Caldwell letter at 1.

In addition, Donadeo is trying to help his fellow inmates.  "David is a 'go-to' person for fellow prisoners at Northwest Ohio Correctional Center.  When asked, he offers help and support because of the loving, compassionate person he is."  *See* Ex. 4, Gail Wetherell-Sack and Paul Sack letter at 2.  Donadeo is dedicating himself to being the best person and father he can be, even while incarcerated.

### E.   Donadeo Tries to be a Good and Honest Person, and this Crime is a Result of Aberrant Behavior

Donadeo is unlikely to reoffend, as this crime is a result of aberrant behavior, at least in part a result of heavy drinking and fear.  A family friend who Donadeo at one time worked for explains, he has "always regarded [Donadeo] as trustworthy, honest, considerate of others, caring and responsible."  *See* Ex. 11, William Kalkreuth letter at 1. This individual goes further and states that despite Donadeo's crime, "[he] can honestly say that I would trust David today."  *Id*.

As Donadeo's wife explains "[Donadeo] has a good heart and will not ever again risk being ripped from his sons' lives due to unwise choices.  Their affection, opinion and love is all that matters, and he will do right and well."  *See* Ex. 10, Julie Donadeo letter at 2.  Additionally, as his sister-in-law explains, "the insights that come from taking responsibility for one's actions will enable [Donadeo] to continue making good choices, so he can stay on the right track for his children."  *See* Ex. 9, Leslie Caldwell letter at 2.  In addition, "[t]he sooner he can be released from prison and back to productive life, the sooner he will be able to repay his debt."  *See* Ex. 1, Joyce and Ronald Rupp letter at 2.  The debt Donadeo owes is not only the financial debt he owes the District, but also the emotional debt he owes for the pain and suffering he has caused his family, especially his sons.  While his wife and son will continue to reside in Spain, there

still is "a sliver of hope that [they] may find [their] way back to each other again." *See* Ex. 10, Julie Donadeo letter at 2.  Donadeo will dedicate his life to making amends to those he has harmed both financially and emotionally.

## VII.   CONCLUSION

The conduct to which Donadeo has pled does not encompass the entirety of his life.  Considered as a whole, Donadeo's life has been a life dedicated to his family.  His actions, while wrong, were taken while alcohol was clouding his judgment.  Donadeo allowed himself to believe the obvious lies he was being told, so that he could take actions to support his family.  Once Donadeo could no longer believe the lies, he felt he was in too deep and feared for his family's safety.  This fear caused him to take his family out of the country where he thought they would be safe.

Since his arrest Donadeo has accepted full responsibility for his actions, and seeks to make amends for his conduct. Donadeo knows he let his parents, siblings, wife, and most importantly his sons down, but by accepting responsibility for his actions and accepting the consequences, Donadeo is demonstrating how to be honest about one's misdeeds, how to accept responsibility for them, and how to properly make amends. Donadeo's desire is to one day be reunited with his sons and once again be a positive role model for them.

When the facts of this matter are taken into consideration, Donadeo's total adjusted offense level should be a 20 because Donadeo should not receive an enhancement for obstruction of justice, should only be held accountable for a loss of $916,948.77, and should receive a 2-level downward adjustment for minor participant. Donadeo also requests, that in determining the number of months he is to serve, the Court take into consideration the absence of any criminal history and the 8 months he

was incarcerated in Spain for which he will not receive credit.  Donadeo further requests that this Court recommend that any term of imprisonment be served at FCI Butner, and that he participate in the Bureau of Prisons Residential  Drug Abuse Program in light of his substance abuse problem.

Respectfully submitted,

s/ *John F. McCaffrey*

John F. McCaffrey (0039486)
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
Telephone: 216.696.3486
Facsimile:  216.592.5009
john.mccaffrey@tuckerellis.com

*Attorney for Defendant* David Donadeo

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2017, a copy of the foregoing **Defendant David Donadeo's Sentencing Memorandum** was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ *John F. McCaffrey*
John F. McCaffrey (0039486)
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
Telephone: 216.696.3486
Facsimile:  216.592.5009
john.mccaffrey@tuckerellis.com

*Attorney for Defendant David Donadeo*

34

013338\000001\3480093.1